Erwin and others *vs.* Moore and others.

No. 50.—JOHN A. ERWIN and others, plaintiffs in error, *vs.* HENRY MOORE and others, defendants in error.

[1.] The intention of the Legislature is the cardinal guide to a construction of Statutes ; and when plainly collected, should be carried into effect, though contrary to the literal sense of terms.

[2.] A repeal, by implication, is not favored ; on the contrary, if a later Act, do not, in terms, repeal an earlier, relating to the same subject, and the later Act do not embrace the whole subject-matter of the prior Act, and is not entirely repugnant to it, the Court should apply such construction as will give to the two, concurrent efficacy.

[3.] *Semble,* that a later Statute, which is general, does not repeal a former, which is particular.

[4.] The second section of the Act of 1822, declaring that " all judgments signed on verdicts, rendered at the same term of the Court, be considered, held, and taken to be of equal date ; and no execution obtained at the same term, shall be entitled to any preference, by reason of being first placed in the hands of the officer", does not repeal the Act of 1814, which provides, that " in all cases, the attachment first served, shall be first satisfied".

[5.] Where several attachments were levied on property of an absconding

debtor, one of them (the latest levied) being on a debt for rent; and at the term of the Court to which the same were returnable, several judgments were obtained, generally, against the debtor, and also a judgment on the attachment for rent due: *Held,* that the fund which had been raised from the property attached, by virtue of the said Act of 1822, should be equally divided among all the judgments; and that that portion which was distributed to the attaching judgment creditor, by virtue of the Act of 1814, should be taken by her, subject to the lien created by that Act, and retained in Court, to abide the ultimate determination of the attachment cases.

Motion, in Cass Superior Court. Decided by Judge JOHN H. LUMPKIN, March Term, 1854.

This was a *motion to distribute money* in the Sheriff's hands. An attachment, at the instance of Erwin, was levied upon the effects of John A. Williams, on 7th December, 1853. Another attachment, in favor of Beach, and one in favor of Farrar & Brothers, were levied the same day. On the 9th of December, 1853, one in favor of Nancy Frix, on a note for rent, was levied on the same effects. All of these attachments were returnable to the March Term, 1854, of Cass Superior Court. At that term, Nancy Frix obtained judgment; and at the same term, judgments upon ordinary process were obtained by Henry Moore and others, against the said Williams.

The effects levied on by the attachments, were sold under an order of the Court; and upon a motion made, at the instance of the creditors who had obtained judgment on ordinary process, to distribute the fund, the Court ordered these judgments to be paid, and refused to grant an order, to pay the amount due on the judgment, to Nancy Frix.

To the order granting the motion made by the judgment creditors, all the creditors, on attachment, excepted. To the refusal of her motion, Nancy Frix excepted Upon these exceptions, error has been assigned.

CHURCH & MILNER, for plaintiff in error.

W. AKIN, for defendant in error.

The Court not being unanimous, delivered their opinions *seriatim.*

Erwin and others *vs.* Moore and others.

*By the Court.*—STARNES, J.

The 26th section of our Judiciary Act of 1799 provided, that "all the property of the party, against whom a verdict shall be entered, shall be bound, from the signing of the first judgment, except where several judgments shall be of equal date, when the first execution delivered to the Sheriff, shall be first satisfied".

Under the effect of this provision, the lien of judgments, in all cases, as well as those in which attachments had issued, as others, took date from the signing of the judgment, or from the delivery to the Sheriff, of the *fi. fa.* when the judgments were of equal date.    In 1810, another Statute was passed, providing that all the property belonging to a defendant, "shall be bound and subject to the discharge of the first judgment or judgments", provided that the demand was made before the money was paid over to the Sheriff, &c.    This Statute seems to have increased the doubt, and added to the contrariety of views on the subject, instead of creating "a regular and definite rule for the priority of judgments", as its somewhat ambitious title promised.    I suppose, that some Courts considered that the provision in the Act of 1799, as to the effect upon judgments of equal date of the delivery to the Sheriff, of the *fi. fa.* was repealed by this Statute, whilst others thought otherwise.

In 1814, a Statute, amendatory of an Act of 1799, regulating attachments, was passed, which provided that in cases of attachment, "in all cases, the attachment first served, shall be first satisfied".    This Act modified the Statute of 1799, first mentioned, or of 1810, so far as to give date to the lien of judgments on attachment, as between attachments, and *quoad* the particular subject-matter of levy, from the time of such levy. This was, as it were, in the nature of a *particular* Statute, because relating only to a particular form of proceeding against debtors, and to a particular class of levies and judgments.

In 1822, our Legislature passed an Act, whose title is "an Act to amend the 26th section of the Judiciary Act, passed 16th

day of December, 1799; and also to prevent a fraudulent enforcement of dormant judgments". The preamble of this Statute refers to the contrariety of decisions which had been made in the different circuits of the State, as to the time when the property of a party, against whom judgment is entered, shall be bound. It also alludes to the evil resulting from judgments being collusively kept open. The 1st section declares, that a lien shall take effect on the defendant's property, from the signing of the first judgment, "in conformity with the said 26th section of the Judiciary Act of 1799," in all cases of appeal. The 2d section enacts, that "all judgments signed on verdicts rendered at the same term of the Court, be considered, held and taken to be of equal date; and no execution, obtained at the same term, shall be entitled to any preference, by reason of being first placed in the hands of the officer". The remaining section makes provision against collusion, in keeping open dormant judgments.

This, of course, is a Statute, *general* in its nature.

It is insisted, that the terms of this Statute are so repugnant to those of the above Act of 1814, that though it contains no express provision of repeal, yet it must be held to repeal that Act of 1814, by implication.

The words, "all judgments signed on verdicts, rendered at the same term of the Court", &c. as contained in the 2d section, are certainly sufficiently general to embrace judgments on attachments. But that they do not, I think is very plainly shown, by the following considerations :

[1.] The intention of the Legislature, is the cardinal guide to construction. "The real intention, when collected with certainty, will always, in Statutes, prevail over the literal sense of terms". (*Dwarr. on Stat.* 690, 11 *Rep.* 73.) Or, as some of our American Courts have phrased it, "in construing a Statute, wherever the intention of the Legislature can be discovered, it should be followed with reason and discretion, though such construction should seem contrary to the letter of the Statute. (*Jackson, ex dem. Scofield vs. Collins,* 3 *Cow.* 89.

*Wilkinson vs. Leland,* 2 *Pet.* 662.     *Riddick vs. Governor,* 1 · *Mis.* 147.     *Beall vs. Harwood,* 2 *Har.* & *J.* 167.)

Now the little summary which I have made of our legislation, on the subject under consideration, shows very plainly, as I think, that in the Act of 1822, the law makers did not in- tend to repeal the Act of 1814; and that they used the words, "all judgments", in the former Act, in the sense of general judgments, other than judgments on attachment.    The title manifests that it was designed to relate to the 26th section of the Act of 1799, and to dormant judgments; the preamble re- fers to the same subject-matter: the several sections are to the same purport, and not the most distant allusion is made, any where in the Act, to the Statute of 1814, or to any law regula- ting attachments.    To my mind, it seems very unreasonable, that the Legislature should have intended, by this Act, to repeal the important provisions of the Statute of 1814, and yet, have made no specific reference to the same.

[2.] The law "does not favor a repeal by implication". And " although two Acts of Parliament are seemingly repug- nant, yet, if there be no clause of *non obstante* in the latter, they shall, if possible, have such construction, that the latter may not be a repeal of the former, by implication".    (*Dyer,* 347.    15 *East.* 377.    *Dwar. on Stat.* 674.)    It has been held, too, that " a subsequent Act, which can be reconciled with a former Act, shall not be a repeal of it, though there be nega- tive words".    (*Dwar.* 674.)    For example—it was decided that the 1 *and* 2, *Phil.* & *M, c.* 10, to the effect, that all trials for treason, shall be according to the course of the Common Law, does not take away 35 *Hen.* 8 *c,* 2, for trial of treason beyond sea.    (*Forster's Case,* 11 *R.* 63.)    And " the Statute 23 *Eliz. c,* 1, which gave 20 *l.* per month, against a recusant, did not take away the penalty of 12 pence, for every Sunday given by Statute 1 *Eliz. c.* 2."    (11 *R.* 63.)

So, in this country, it has been held, that " a later Statute on a given subject, not repealing an earlier one, in terms, is not to be taken as a repeal, by implication, unless it is plainly re- pugnant to the former; or unless *it fully embraces the whole*

subject-matter". *Dugan vs. Gittings,* (3 *Gill.* 138.) *The State vs. Woodside,* (9 *Ire.* 496.)  "A repeal, by implication, is not favored; on the contrary, Courts are bound to uphold the prior law, if the two Acts may well subsist together". *Bowen vs. Lease,* (5 *Hill,* (*N. Y.*) 226.)  *Bruce vs. Schuyler,* (4 *Gill.* 221.)  "Where the provisions of two Statutes are so far inconsistent with each other, that both cannot be enforced, the latter must prevail; but if, by any fair course of reasoning, the two can be reconciled, both shall stand".  *Ludlow vs. Johnston,* (3 *Ham.* 553.)

Taking these principles into consideration, and looking upon the Act of 1822, as relating to all judgments, except where the question of a priority of lien upon a particular fund, arises as between attachments; and the Act of 1814, as intended simply to regulate this question of lien between attachments, I have no difficulty in giving what is called "concurrent efficacy" to these Acts.

[3.] There is another rule of construction which is sometimes recognized, and is somewhat appropriate to this subject, though not necessary to the view I take: "a later Statute, which is general, does not abrogate a former, which is particular". (*Dwar.* 674.)  Thus: the Statute, 5 *Eliz. c.* 4, declaring that *no person* should use a trade without having been apprenticed, upon pain of 40 shillings per month, did not repeal 4 & 5 *Phil. & M. c.* 5, to the effect, that *no weaver* should use such a trade, without apprenticeship, upon pain of forfeiting his cloth.  (6 *Rep.* 19, *b.*)  So, it has been held, that a general law, fixing the rate of interest, does not repeal the special law, fixing the rate to be paid by a particular bank.  *McFarland vs. The State Bank,* (4 *Pike,* 410.)  To the same effect, *McRae vs. Wessell,* (6 *Ired.* 153.)

[4.] Thus it is, that, in my opinion, the Acts of 1822 and 1814, may stand together, that the general rule prescribed by the first, may be enforced, and the particular or exceptional rule, provided by the second, remain unimpaired, that all the mischiefs contemplated in the passage of the Act of 1822, may be remedied, and all the benefits sought by the

Erwin and others *vs.* Moore and others.

Statute of 1814, secured. Whereas, if we hold that the Act of 1822 repeals the Act of 1814, the remedies which we recognise as having been contemplated in the passage of the Act of 1822, are in no wise advanced; whilst all advantage arising out of the other Act, to the vigilant attaching creditor, over him who sleeps upon his rights, or is colluding with the absconding debtor, is entirely lost.

[5.] Applying these principles to the case at bar, I hold, that the Act of 1822 gives to these judgments a lien upon the fund to be distributed—the attachment judgment of Mrs. Frix, equally with the general judgments. There being enough of the fund to pay off all the judgments, the 'general judgment creditors receive their share, and take their leave of the matter, and of Court. But the attachment judgment creditor takes his proportion of the fund, subject to the particular or exceptional rule, relating to attachments, which is found in the Act of 1814; and as the law which gives rise to this rule, creates a lien upon the fund in his hands, he receives that fund, subject to that lien; and the Court may compel him to leave the same within the control of its officers, until the relative rights of himself, and those other attaching creditors, are determined. There is no difficulty or complicity in such a rule. Its practical operation is easy and advantageous.

No real difficulty would present itself, even if the fund were not sufficient to pay off the general judgments. In that case, they would share the fund rateably with the attachment judgment; and as to that fund, would then be dismissed the Court. Their lien upon so much of the fund as had been distributed to the attachment judgment, would have been, by it, divested.—The right of the attaching judgment creditor to the fund, as between himself and those standing by the Act of 1814, *in re pari* with him, would then be determined by that Act; and thus, again, the two Statutes would consist and operate together.

Let the judgment be affirmed.

LUMPKIN, J.—concurring.

The questions in this case, are presented upon the following state of facts, to wit: An attachment, at the instance of John A. Erwin, was levied upon the effects of Allen A. Williams, an absconding debtor, on the seventh day of December, eighteen hundred and fifty-three; another attachment, in favor of William H. Beach, was levied upon the same effects, on the seventh day of December, eighteen hundred and fifty-three; another attachment, at the instance of S. S. Farrar & Bro., was levied upon the same goods, on the seventh day of December, eighteen hundred and fifty-three; and another attachment, at the instance of Nancy C. Frix, was levied, on the ninth day of December, eighteen hundred and fifty-three—all of which attachments, save that of Nancy C. Frix, were upon ordinary notes of hand, and returnable to March Term, 1854, of said Court. The attachment of Nancy C. Frix, was founded on a note for rent, to become due on the twenty-fifth day of December, eighteen hundred and fifty-three, and was returnable to March Term, 1854, of said Court.

And, at said term, judgment, upon ordinary suit, was had by Henry Moore, William H. Howard, Howard & Gardiner and A. D. King & Co., against said Allen A. Williams. The claim of Nancy C. Frix was also sued to judgment, at the said March Term, 1854, of said Court.

A fund was raised, by the sale of said goods under attachment, sufficient to satisfy said judgments of Henry Moore, William H. Howard, Howard & Gardiner, A. D. King & Co. and Nancy C. Frix; but not sufficient to satisfy, also, the attaching claims of said John A. Erwin, William H. Beach and S. S. Farrar & Bros. At March Term, 1854, of said Court, the attorneys of said Henry Moore, William H. Howard, Howard & Gardiner and A. D. King & Co., moved an order, requiring the Sheriff of said county, to pay over to them the amounts due on their several and respective judgments; to which, the attorneys of said John A. Erwin, William H. Beach and S.

S. Farrar & Bros. objected, because the judgment obtained at this term of the Court, upon the attachment debt of Nancy C. Frix, was of equal dignity with said claims of Henry Moore, Howard & Gardiner, William H. Howard and A. D. King & Co., and was entitled to payment, equally with them; and that said debt of Nancy C. Frix being levied after . those of John A. Erwin, William H. Beach and S. S. Farrar & Bros., should not be preferred over them, but should be postponed—which point the Court over-ruled, and decided that said judgments were entitled to the full amount due upon them, and granted said order.

The attorneys of Nancy C. Frix then moved an order, that the Sheriff pay over to them the amount of her judgment, obtained at the same term as the judgments which were ordered to be paid; which order the Court refused to grant, but decided that said judgment was not, at that time, entitled to any part of said fund, but should be postponed until the other attachments went to judgment, and might then be paid, according to the time at which each attachment was levied. To which rulings and decisions, counsel for John A. Erwin, William H. Beach and S. S. Farrar & Bros. excepted, because the judgment of Nancy C. Frix, being of equal dignity with those of Henry Moore, William H. Howard, Howard & Gardiner and A. D. King & Co., was entitled to equal payment with them; and that the attachment of Nancy C. Frix, being levied after those of John A. Erwin, William H. Beach, and S. S. Farrar & Bros., should not be preferred over them, but should be postponed.

And the counsel for Nancy C. Frix excepted to the ruling and decision of the Court, because her judgment being obtained at the same term of Court with those which were ordered to be paid out of the attachment fund, was entitled to. equal satisfaction.

And the counsel for John A. Erwin, William H. Beach, S. S. Farrar & Bros. and Nancy C. Frix, says, that the Court erred in refusing to rule—

1st. That the judgment of Nancy C. Frix, being of equal dignity with those of Henry Moore, Howard & Gardiner, William H. Howard and S. D. King & Co., was entitled to equal payment with them; and that said attachment being levied after those of John A. Erwin, William H. Beach and S. S. Farrar & Bros., should not be preferred over them, but should be postponed.

2d. That the judgment of Nancy C. Frix, being obtained at the same term of Court with those which were ordered to be paid out of the attachment fund, was entitled to equal satisfaction.

I am for affirming the decision of the Circuit Court, upon all the points raised in this record. That is, first, in ordering the money in hand, to be divided between the judgments obtained in the ordinary suits, and the attachment judgment of Mrs. Frix—all of these judgments being of the same date. Secondly, in allowing the ordinary judgment creditors to retire with their money, inasmuch as they were entitled to priority of payment, over attachment creditors, whose suits had not matured into judgment; and lastly, in directing that the fund distributed to Mrs. Frix, and which was sufficient to satisfy her demand, should be retained in Court, subject to the claim of the attaching creditors, whose attachments were served before that of Mrs. Frix, but whose judgments would be younger than hers, owing to the fact that her debt was for rent; and, consequently, went into judgment at the first term.

The disposition of this money was in accordance with the practice of Courts—so far as I am acquainted with it, is in conformity with the opinion of this Court, in 3 *Kelly*, 169, and 5 *Ga. Rep.* 176; and is admitted to be law, unless, as counsel contend, the 7th section of the Act of 1814, (*Cobb*, 74,) is repealed by the 2d section of the Act of 1822, (*Cobb*, 497); and it is to that inquiry, that I propose to address myself.

Is the 7th section of the Act of 1814, which provides, that in all cases of attachment, the one first *served*, shall be first *satisfied*, repealed by the 2d section of the Act of 1822, which declares, that all judgments signed on verdicts rendered at the

same term of the Court, shall be considered, held and taken to be of equal date? In other words, was this Court mistaken in holding, as it did, in *McDougald vs. Barnard,* (3 *Kelly,* 169,) that in all collisions between *attachments,* it is the *levy* which fixes the *lien* and not the *judgment.*

This is, if I understand it, a fair statement of the proposition.

No one denies or doubts, that judgments obtained in ordinary suits, whether as between themselves, or in a contest with attachment judgments, are to be paid according to their date. But we had supposed, and do still think, that, in a conflict between attachments only, it is the *levy* and not the *judgment,* which fixes the lien. And that, notwithstanding the attachments may all go into judgment at the same term; or the junior attachments, from being founded on a rent note, or from any other cause, should go into judgment first, as in the present, case, that still, in obedience to the plain and imperative mandate of the Act, as understood and administered for forty years, that the attachment first *served,* should be first *satisfied.* Such is the unmistakeable language of the 7th section of the Act of 1814. And such, it is admitted, is the law of the State, unless that section of the Statute is repealed by the Act of 1822.

Does the 2d section of the Act of 1822, repeal the 7th section of the Act of 1814, either by express words, or "*necessary, irresistible implication*"? It is not pretended there is any express repeal. Are the two Acts, then, so clearly and indisputably contradictory and contrary to each other, that they cannot be reconciled? "The leaning of the Courts", says Mr. *Dwarris,* on Statutes, "is so strong against repealing the positive provisions of a former Statute, by construction, as almost to establish the doctrine of 'no repeal by implication'.— *(Page* 531.) And the doctrine to be found in all the books is, that the law does not favor this mode of repeal, as it carries with it a reflection on the wisdom of the former Legislature. (11 *Reports,* 63. *Dyer,* 347. 15 *East.* 377.)

But, admitting the maxim, *leges posteriores contrarias abro-*

*gant,* that is, that if two inconsistent Acts be passed, the first must give way, and the last be obeyed; yet, there are certain rules which have been prescribed, to test the question of repugnancy—or, rather to ascertain whether obedience may not be yielded, both to the old law and the new, without derogating from either. I will state several of them.

A later Statute, which is general and affirmative, does not abrogate a former, which is particular. (6 *Reports,* 19 *b.*)

Sir *O. Bridgman* lays down this doctrine: "that the law will not allow the exposition of a Statute, to revoke or alter, by. *construction of general words, any particular Statute,* where the words may have their proper. operation without it." *Lyn vs. Wyn,* (*Bridgman's Judgments,* 122.) *Darcy's Case,* (*Cro. Eliz.* 512.)

A subsequent Act, which can be reconciled to a former Act, shall not be a repeal of it, though there be negative words; as the 1 & 2 *Ph.* & *M. c.* 10, that *all trials for treason,* should be according to the course of the Common Law, *and not otherwise,* does not take away 35 *Hen.* 8 *c.* 2 for trial of treason, *beyond sea. Forster's Case,* (11 *Reports,* 63.)

So, where there is a complete difference in the whole purview of two Statutes, apparently relating to the same subject, as *Excise* Licenses and *Justice's* Licenses, for selling spirituous liquors, the former Act remains in force. *King against M. Downs and another,* (3 *T. R.* 567.)

Let us now collate the several Acts, or parts of Acts, which relate to this subject.

By the 26th section of the Judiciary Act of 1799, it is provided: "that all the property of the party against whom a verdict shall be entered, shall be bound from the signing of the first judgment; but where several judgments shall be of equal date, the first execution delivered to the Sheriff, shall be first satisfied". (*Cobb,* 494.)

By this Statute, it will be perceived, that the first judgment fixes the lien; and that where there are several judgments of equal date, then the priority or preference was to be settled by the first execution delivered to the Sheriff.

By the Act of 1810, all judgments are made to rank by priority of date, in the distribution of money, provided the demand of such right, is made before the Sheriff, Coroner or Constable, paid the money over to the plaintiff in interest. The Act is silent, as to any advantage resulting from the first delivery of the execution. (*Cobb*, 495, 496.)

Independently of the General Judiciary Act of 1799, the 26th section of which I have quoted, there was a separate Attachment Law, passed the same year, as seems to have been usual with past assemblies. They never blended this summary proceeding by attachment, with actions commenced by ordinary process. They are kept distinct, in all of our legislation ; a fact important to be noted.

Prior to 1814, I am unable to ascertain what was the practice of the Courts, either as to the conflict of liens between attachments, themselves, or attachments and ordinary judgments. As it respects the satisfaction of attachment judgments, the only direction of the law is, that the money be paid into Court, and the surplus, if any, turned over to the defendant, or held subject to the further order of the Court.

In 1814, the Legislature passed an Act, not amendatory of the Judiciary Act of 1799, but of the general Attachment Law of the 18th of February, 1799 ; and by the 7th section thereof, declared that "in all cases, the attachment first served, should be first satisfied". (*Cobb*, 74.) Having used the broad terms, that in *all cases*, instead of saying in all *attachment* cases, to prevent a misconstruction of their meaning, and to limit the preference thus created, to a contest between attachments only, the 8th section provides, that "no lien shall be created by the levying of an attachment, to the exclusion of any judgment obtained by any creditor, before judgment is obtained by the attaching creditor". (*Ib.*)

As to the proper exposition of these two sections of the Act of 1814, we refer to the two cases, already cited, in 3 *Kelly* and 5 *Ga. R.* If I have not misunderstood the argument, the soundness of that exposition, apart from the Act of 1822, is not disputed.

Thus, then, stood the law of liens in this State, in 1814—namely: that in a controversy between ordinary judgments, the oldest took first. If several were of the same date, some of the Courts, I infer from the Act of 1822, held that they divided the money ratably, while other Judges were of the opinion that the Act of 1810 did not repeal that clause in the 26th section of the Act of 1799, which made the priority of lien depend upon the first delivery of the execution to the officer, where the judgments were of equal date. There seems to have existed, also, some contrariety of opinion, as to the force and effect of a first judgment, in appeal cases. In a conflict between ordinary and attachment judgments, the same rule prevailed, viz: the date of the judgment fixed the lien in all such cases. But in a contest between attachments, the first served had first to be satisfied. And in this state of the question, the Act of 1822 was passed.

It purports, in its title, to have a two-fold object to accomplish. First, " to amend the 26th section of the Judiciary Act of 1799" ; and secondly, " to prevent the fraudulent enforcement of dormant executions". With this latter provision, we have, at present, nothing to do.

It will be recollected what was the 26th section of the Judiciary Act of 1799, which is thus recited in the title, to the Act of 1822. It was, that the lien of ordinary judgments, was determined by their date ; so, that several judgments, rendered on different days of the same term, took precedence of each other, according to their respective dates. And this preference was left undisturbed, by the Act of 1810. It also directed, that where several judgments were signed on the same day, of the same term, that in such case, ·the first delivery of the execution issuing on said judgments, should determine the preference. By the Act of 1810, it was left doubtful, whether the provision had been disturbed.

Now, then, for the mischief; for in cases like this, we must ever keep a steady eye on the resolutions of the Barons of the Exchequer, in *Heydan's Case,* (3 *Rep.* 7,) if we would attain to the sure and true interpretation of Statutes, namely : the

,old law—the mischief—the remedy, and the true reason of the·
remedy. Let the preamble, itself, speak upon this point. It
recites, that "a contrariety of decisions, having taken place in·
the different circuits in this State, as to the time when the·
property of the party, against whom a judgment is entered;.
shall be bound," &c.

"*Be it enacted*, That from and after the passing of this Act
*all* (?) property of the party against whom a verdict shall be
entered, and a judgment signed thereon, in conformity to the
provisions of the 26th section of said Act of 1799, shall be bound·
from the signing of the first judgment, in cases where no ap-
peal is entered; but in cases where an appeal is entered from
the first verdict, the property of the party against whom the
verdict is rendered, shall not be bound, except from the sign-
ing of the judgment on the appeal, except so far as to prevent
the alienation, by the party, of his, her or their , property, be-
tween the signing of the first judgment and the signing of the
judgment on the appeal.

"SECTION II. All judgments signed on verdicts rendered at
the same term of the Court, (shall,) be considered taken, and
held to be of equal date; and no execution founded on said
judgments, obtained at the same term, as aforesaid, shall be
entitled to any preference, by reason of being first placed in
the hands of the officer". (*Cobb*, 496, 497.)

Did this Act intend to interfere with the relative lien of at-·
tachments, as fixed by the Act of 1814? Does it refer to
attachment judgments at all? Does it not relate exclusively
to the lien of ordinary judgments, as adjusted by the Acts of
1799 and 1810, and the contrariety of decisions made by the
Courts, upon these Acts? Why amend the 26th section of
the Act of 1799, in order to reach and control attachment
liens, which did not come under, and were not regulated by it?

Indeed, the first section of this Act establishes, conclusively,
upon its face, that it does not apply to attachment judgments.
It declares, that from and after its passage, that "*all* the property
of the defendant, against whom a verdict shall be entered, and
a judgment signed thereon, &c." whereas, in cases of attach-

ment, the lien fastens only upon the property attached. It also contemplates an appeal, whereas there is no appeal in cases of attachment, except where the party appears and defends, or replevies, or puts in special bail, &c.; in which case it ceases to be an extraordinary proceeding, and becomes an ordinary suit against the person.

But I forbear to analyze any clause in the first section.

But, it is said, that the terms used in the second section of this Act, are exceedingly broad; and that it makes the judgment, alone, fix the lien in all cases. Does any one doubt, looking that section fully in the face, what is its true intent and meaning? The Act of 1822, was designed to amend the 26th section of the Judiciary act of 1799. The first section is declaratory of the law in a matter, about which there had been a contrariety of judicial opinion. The second section, so far modifies the 26th section of the Judiciary Act of 1799, as to make all judgments obtained at the same term, of *equal date*, and not of different dates, because rendered on different days. And it further amends said 26th section, by negativing the provision which made the first delivery of the *fi. fa.* the ground of preference, where the judgments were of equal date.

And here again, we find language which is inconsistent with the idea, that attachments were intended to be included. In declaring all judgments obtained at the same term, to be of equal date, it designates such judgments, as required for their enforcement, *executions to issue.* But executions do not issue, in cases of attachment. Often, the property levied on is sold, and the money brought into Court, before the judgment is rendered; but where this is not done, the sale, after judgment, is made under an order of the Court, and not under execution.

In short, there is not a sentence in either of these sections, which, so far from favoring, does not negative the idea, that the Act was intended to apply to cases of attachment.

But we are told, that conceding that this is true, that nevertheless, by adopting this construction, and making the judgment fix the lien, *in all cases,* that we avoid a dilemma, from which we narrowly escaped, in the case before us. That if the

attachment first served, had gone into judgment, and the money in hand had not been enough to pay all the judgments, it never could have been distributed.    That so soon as Mrs. Frix, who had the youngest attachment, drew her *pro rata* share of the money, on account of equality in date, with the ordinary judgments, that the attachments *served* before hers, would have seized and appropriated it.    But that no sooner would the older attachments have taken it, than the ordinary judgments would have wrested it from them, because they had older judgments than the older attachments.    And so, the money would have travelled in a circle, till the end of time.

I once said, in anticipation of this difficulty, "sufficient unto the day is the evil thereof."    And we are reminded, by our young brother Church, whose debut in this case, foretokens his future professional distinction, that that day is upon us.    Well, what I have to say is, that difficulties, as well as greatness, are often magnified by distance ; and both diminish, upon a nearer approach and contemplation of them.    And the promise is, that as our days, so shall our strength be.    And this is verified in the physical and mental, as well as in the moral world.

But to return to the point, from which we are so prone to wander—does not the principle of the decision made in this case, meet the emergency of the one supposed?    A has an ordinary judgment for $100 ; B, an attachment judgment for $50, of the same date ; and C, an attachment judgment for $50, younger than either, but founded on an attachment, *served* before B's.    There is $100 to be apportioned :    A takes $66.66⅔, and B, $33.33⅓.    Now upon the doctrine of judgment liens, A has got all to which he is entitled.    Suppose, then, C should come forward and dispossess B of his dividend, by virtue of another law of liens, namely : that regulating *attachments*—what pretence of right would A have, to deprive C of this fund ?    He planted himself upon his *judgment* lien, and by that, he settled and received all that he was entitled to— why should he now "*intervene*", and claim the benefit of another law of liens, regulating attachment, and not judgment liens ?

But suppose the principle adopted in this case, be not sound, is there not another mode, by which the entire fund, or almost the entire fund, would ultimately be absorbed by A, the ordinary judgment creditor, and thus disentangle the supposed Chinese puzzle? Let us resume the illustration already put. We have traced the $33.33⅓, originally appropriated to the younest attachment served, but oldest attachment judgment, through B and C, back to A again, the ordinary judgment creditor. Now the error in the solution of this legal crotchet, heretofore attempted, consists in supposing that the entire amount of $33.33⅓ would continue to perform the same sisyphian labor; but not so—this sum would again be sub-divided between A and B, the former, as before, taking two-thirds, and the latter one-third. And so, in passing round, this, the same sub-division, would be repeated until nothing but an infinitesimal portion would be left.

And foreseeing this, the Court would order, at once, the judgment of A, to be satisfied, in whole or in part, according to the amount of money in hand; and the balance, if any, to be paid to C, in case of a deficiency to satisfy the whole.

I do not say that this would be right; on the contrary, I insist, that the position taken by the Circuit Judge, in this case, is the true one. I submit the foregoing, merely, as a practical solution of the supposed enigma, although not expert in answering conundrums.

But grant that the Court below was in error, and that the quibble remains unexplained, does it justify this Court in doing what the Legislature have failed to perform? Can we make a law to meet the case, or what is tantamount to it, can we invoke a rule from an Act, confessedly foreign to the subject, and apply it, arbitrarily, to this case? It may be a good rule to make judgments the only foundation of liens, in all cases; it would certainly avoid the perplexity which a conflict of liens, based upon different principles, sometimes creates, perhaps in one case out of a hundred, and more. It may be expedient to take away the encouragement held out by the 7th section of the Act of 1814, to the vigilant creditor; still, all this is no

Erwin and others *vs.* Moore and others.

sufficient reason for a Court to render, for not administering the law as it is.

Evils infinitely greater in number and magnitude, are likely to result to the country, from the improvident Act passed by the last Legislature, upon the subject of granting new trials, than that growing out of a coflict of liens; yet, we have felt that the mandate of the Legislature was obligatory, and we have not hesitated to obey it. And we did right, for I hold, that the fundamental rule, the *lex. legum,* for the construction of deeds, wills and all written instruments, as well as of statutes and constitutions, is to ascertain the design and intent of the framer; and when the meaning is indisputably found out, that shall prevail, unless controlled by some higher law.

In applying rules for the construction of statutes, we should never, says *Vattel,* lose sight of their object; for that must be the truest exposition of the law, which best harmonizes with its design, its objects, and its general structure. (*B.* 2, *C.* 17, §285.) Said Lord *Mansfield,* in *Pray vs. Edie,* (1 *T. R.* 313,) "whatever doubts I may have in my own breast, with respect to the policy or expediency of this law, I am bound to see it executed according to its *meaning*". "Every statute ought to be expounded according to its *meaning*". (11 *R.* 63.)

If this rule be granted, I ask, did the Act of 1822 intend to repeal the Act of 1814? Was this its object? Cannot these too Acts subsist together? Although both relate to liens, is not the whole purview of the two Acts different; the one has reference to ordinary judgments, the other to attachment liens. Is not the effect attempted to be given, and so far as I know, for the first time, to the words " *all judgments*" in the beginning of the 2d section of the Act of 1822, in direct contravention of the rule laid down by Sir *Orlando Bridgman,* in *Lyn vs. Wyn,* that the law will not allow such an exposition to be given to a statute, as by the construction of general words, to revoke a particular statute, where the words may have their operation without it?

While Lord *Kenyon,* in *Williams vs. Pritchard,* (4 *T. R.* 2, 4,) held that a subsequent Act of Parliament would control the

provisions of a prior statute, if it were intended to have that operation; yet, he held, that when it was apparent that it was not intended, that the subsequent Act should have such effect, that there, although the words were broad enough to repeal the former Act, yet, the Courts had held, that, in such case, they ought not to be so construed.

It will not be profitable, I apprehend, to extend this discussion. If I am at fault in this matter, I confess myself *inops consilii*—wanting in wisdom to discern the truth. I seldom express myself with such confidence, for I rarely feel the same overpowering convictions of intellectual truth.

BENNING, J.—dissenting.

On the 7th day of December, 1853, three attachments were levied on the same effects of Allen A. Williams, an absconding debtor—one in favor of John A. Erwin, one in favor of Wm. H. Beach, and one in favor of S. S. Farrar & Bros.

On the ninth of the same month and year, another attachment, at the instance of Nancy C. Frix, was levied.

The attachments were all returnable to the March Term, in 1854, of Cass Superior Court.

At that term, judgments upon ordinary process, were rendered against the said Allen A. Williams, in favor of Henry Moore, of Wm. H. Howard, of Howard & Gardiner, and of S. D. King & Co.

At the same term, judgment was also rendered, in favor of Nancy C. Frix, on her attachment.

There had been a fund raised, by the sale of the attached effects, sufficient to satisfy all these judgments; but not sufficient to satisfy them, and also the attachments of Erwin, Beach, and S. S. Farrar and Bros., not then carried into judgments.

Erwin and others *vs.* Moore and others.

At the same March Term, 1854, the plaintiffs in the general judgments, moved for an order to require the Sheriff to pay over to them the amounts due on their judgments.

This motion the plaintiffs in the *older* attachments objected to, because the judgment of Nancy C. Frix, was of equal dignity with those judgments; and yet, being upon an attachment which was levied after the levy of their attachments, should not, as they insisted, be preferred to their attachments, but should be postponed to them.

This objection the Court over-ruled, and decided that the general judgments were entitled to the full amount due upon them, and so made the order moved for.

Nancy C. Frix then moved for an order to the Sheriff, to require him to pay over to her the amount due on her judgment, as it had been obtained at the same term at which the judgments ordered to be paid, had been obtained.

The Court refused to give the order, but decided that this judgment was not, at that time, entitled to any part of the fund; but that it should be postponed until the other attachments went into judgment, and that it might then be paid according to the time at which each attachment was levied.

To these "rulings and decisions", the plaintiffs in the older attachments, and also the plaintiff in the younger, excepted—the former, on the ground that the judgment of Nancy C. Frix, being of equal dignity with the general judgments, was entititled to equal payment with them, and that her attachment having been levied after the levy of theirs, should be postponed, and not preferred to theirs—the latter, on the ground that her judgment having been obtained at the same term at which the general judgments, ordered to be paid, had been obtained, was equally, with them, entitled to be paid.

The plaintiffs making these exceptions, brought the exceptions before this Court, and it over-ruled them, and affirmed the decisions of the Court below.

From this judgment of this Court, I dissent, for these reasons:—

The Judiciary Act of 1789 declares, that "all of the pre-

Erwin and others *vs.* Moore and others.

perty of the defendant shall be bound from the day of *signing judgment*". (*Watk. Dig.* 391.)

The Judiciary Act of 1792, makes the same declaration. (*Ib.* 481.)

The Judiciary Act of 1797, makes the same declaration, with the exception, that for the words, "from the day of sign- ing *judgment*", it substitutes, "from the day of obtaining *the first verdict*".

The Judiciary Act of 1799, restores the old words, and makes additions of its own. It says: "and all the property of the party against whom such verdict shall be entered, shall be bound from the signing of the *first* judgment; *but where several judgments shall be of equal date, the first execution delivered to the Sheriff, shall be the first satisfied*".

In 1810, the Legislature passed "an Act, to point out a regular and definitive rule for the priority of judgments, obtain- ed in the several Courts of this State". It declares, that "all judgments obtained in the Superior, Inferior or Justice's Courts of this State, shall be entitled to the right or claim of any money received by the Sheriffs, Coroners, or Constables, agreeable to the date of such judgment or judgments; and that all the property belonging to the defendant or defendants, shall be bound, and subject to the discharge of the first judg- ment or judgments, obtained in either of the aforesaid Courts: *provided*, the demand of such right is made, before any of the aforesaid officers have paid the money over to the plaintiff in interest". (*Cobb*, 495-'6.)

The chief, if not the only object of this Act, seems to have been, to put judgments of Justice's Courts, upon the same footing as that of judgments of the Superior and Inferior Courts; and to let the judgments of all of those Courts, thus put upon the same footing, bind *money* in the hands of executive officers, agreeably to the dates of the judgments, just as those judgments bound *lands and goods* of the defendant.

Until the passage of the Act of 1814, to amend the Attach- ment Act of 1799, these parts of the Acts referred to, con- tained all the law known to me, for regulating precedence

Erwin and others *vs.* Moore and others.

among creditors pursuing their debts at law, whether by the ordinary process against the person, or by the extraordinary process against the property. The law thus contained, extends to *all* judgments.

What is the rule of precedence, finally prescribed by these Acts? It is this—in the language of the Act of 1799 : "all the property of the party, against whom such verdict shall be entered, shall be bound from the signing of the first judgment; but where several judgments shall be of equal date, the first execution delivered to the Sheriff, shall be the first satisfied". The Act of 1810, did not repeal this rule—it made a new rule, with respect to the claim of *money.*

This being the rule as to precedence among creditors, the Act of 1814 was passed. That Act is entitled " an Act to amend an Act, to regulate *attachments* in this State, passed the 18th day of February, 1799". In its seventh section, it says, that " in all cases, the attachment first served, shall be first satisfied". What is meant by the words, "all cases"? Plainly, all cases of *attachment.* " In all cases of *attachment,* the attachment first served, shall be first satisfied".

That this is the meaning, is shown by another thing. The *title* of this Act of 1814, and the title of the Act of which it, is amendatory, have in them nothing, except what relates to *attachments.* To say, therefore, that the Legislature intended the body of the Act to contain anything else, is to say the Legislature intended to violate the Constitution.

Section seven, then, is confined to " cases" of *attachment.* What is its effect upon them? It is to *exclude* them *all* from the operation of the old rule—the rule aforesaid, of the Judiciary Act of 1799—as to precedence among creditors. It is to make precedence, in cases of attachment, depend, not on the priority of the judgment, but on the priority of the service of the attachment.

This is section seven. Touching it, comes section eight, and says : "no lien shall be created, by the levying of an attachment, to the exclusion of any judgment". Exclusion from what? Undoubtedly, from the *old rule*—the rule from which

section seven, taken by itself, excludes *all* attachment judgments.

Let us, then, so read the section : " no lien shall be created by the levying of an attachment, to the exclusion, *from the old rule*, of any judgment". What sort of judgments ? Manifestly, such as are excluded from the old rule, by section seven, viz : *attachment* judgments, and no others.

Let us, then, so also read the section : " no lien shall be created by the levying of an attachment, to the exclusion, *from the old rule*, of any *attachment* judgment, obtained by any creditor, before judgment is obtained by the attaching creditor". What attaching creditor ? Plainly, *the creditor levying that attachment..* The section, therefore, may also be so read.

But even then, the section will not be full. Other words will have to be supplied. As it stands, it is still a negative pregnant, of which the word "before" is the sign. What is the affirmative, which the negative carries within it ? The easiest way to answer this, is to supply the affirmative. When seen, it will speak for itself: "no lien shall be created by the levying of an attachment, to the exclusion, *from the old rule*, of any *attachment* judgment, obtained by any creditor, before judgment is obtained by *the creditor levying that attachment ;* but a lien shall be created, by the levying of an attachment, to the exclusion, from the old rule, of every attachment judgment *not* obtained *before* judgment is obtained by the creditor levying that attachment"—that is to say, to the exclusion of all attachment judgments, obtained at the *same time* at which judgment is obtained by the creditor levying that attachment, or afterwards.

The result, according to this exposition is, that section eight is merely an exception to section seven. The rule in section seven includes within it, *all* cases of attachment. The Legislature did not wish to include *all.* They, therefore, by section eight, excluded from the rule, certain of the cases which the rule included, viz: the cases which, although not served

first, should get into judgment *before* the cases which were served first, should get into judgment.

This exposition makes the section consistent with the title of the Act, and therefore, with the Constitution. It makes the section have something to do, namely : to restrain the generality of section seven ; and it finds a remedy for what may be supposed to have been the mischief intended to be remedied by both sections. What was that mischief? The rule of precedence, among creditors, prescribed by the Judiciary Act of 1799 was, that " all of the property of the party against whom such verdict shall be entered, shall be bound from the signing of the first judgment; *but where several judgments shall be of equal date, the first execution delivered to the Sheriff, shall be the first satisfied*"—that is to say, if *judgments* are of equal merit, then the *fi. fa.* of most merit—the *fi. fa.* which gets itself first delivered to the Sheriff, and thereby does all it can, to be the first to seize the defendant's property, shall be the first satisfied. Now, *this* rule of precedence did not extend to attachment cases. In them, the property is seized at the start, before the time of *fi. fas.* has come. May not the Legislature have thought a rule good as to one class of creditors, viz: those by ordinary suit, would be good for another class, viz: those by extraordinary suit; and therefore, have considered it a mischief needing remedy, that this latter class should be without the benefit of such a rule ? What was the legal spectacle before the Legislature ? It saw, among creditors, by general judgments of equal date, those who were most active to get property seized under their *fi. fas.* prefered; but that among attachment creditors, having judgments of equal date, those who had first caused the property to be seized—that is, those who had first served their attachments, were not preferred, and what was more natural than for it to say— why this discrimination in the rule, when there is none in the reason of the rule ? It is a mischief. It shall be remedied. Judgment creditors, by attachment, shall have the same fare as judgment creditors, by ordinary process. Now, my exposi-

tion of section eight effects this.  That exposition is, that among attachment judgments of the *same date*, the one founded upon the attachment first served—first seizing property, shall be first satisfied.  But where the attachment judgments are *not of the same* date—where one is "obtained *before*" another is, it shall be preferred to that other, although that other may be founded upon an earlier served attachment, and this, in analogy to the rule, as to ordinary judgments of *different* dates.

If I am right in this, I am right in dissenting from the judgment of the Court.  Nancy C. Frix's attachment judgment was obtained *before* the other attachments were carried into judgment.  She, therefore, according to my interpretation of the law, had the preference over the other attachment creditors, although their attachments were served two days before hers was.  The judgment of the Court said, in effect, that she had not this preference.

But, I have two special objections to that judgment.  They have already been shadowed forth.  They are, first, that that judgment, as I think, makes the Legislature intend, first, an unconstitutional thing ; second, a useless thing.

That judgment, according to my understanding of what the Court said, when delivering it, assumes that the words " any judgment", in the said eighth section, mean any judgment by *ordinary* process, and do not mean any judgment by *attachment*.

Now, if those words do mean this, they mean something different from anything contained in the title of the Act.  The title is, " An Act to amend an Act, entitled 'an Act to regulate *attachments* in this State', passed the 18th day of February, 1799".  (*Lamar's Com.* 69.)  There is nothing in this about judgments by *ordinary* process.  To say, therefore, that the Legislature, by the words " any judgment", in section eight, intended judgments of this kind, is to say it intended what was unconstitutional.  To say the Legislature intended that kind, and not attachment judgments too, is to say this in a still greater degree.

Indeed, there is no other part of the *bodies* of either this Act, or of the Act which it amends, which, as it seems to me, can, by any kind of construction, be made to refer to ordinary judgments. Why should this part be an exception to all the rest ?

And this brings me to my second objection, which is, that if the words "any judgment" mean only any judgment by *ordinary* process, they mean a useless thing. They have a meaning, indeed, which renders the whole of section eight useless. Why ? Ordinary judgments were not affected at all by section seven. The words of that section are, "in all cases the *attachment* (*not* the ordinary process) first served, shall be first satisfied". This then, does not affect ordinary judgments—does not exclude them from the rule of precedence made for them. And if this does not, no other part of the Act does. For aught that there is in this Act, then, ordinary judgments stand just as they stood before it existed. This being so, let us read the eighth section with that meaning supplied, which the judgment of the Court assumes to be its true meaning : "No lien shall be created by the levying of an attachment, to the exclusion of any *general* judgment, (that is to say, to the exclusion of any judgment which there is no rule that excludes,) obtained by any creditor, before judgment is obtained by the attaching creditor".

Now, to say the Legislature meant this, is to say it meant a useless thing.

I would ask, is not one thing perfectly clear, viz : that the the judgment of this Court must have been what it was, if there had been in the Act no section eight, but only a section seven. The judgment, in effect was, that the ordinary judgment creditors should be preferred to the older attachment creditors. This they were entitled to, by the Act of 1799, their judgments being older. But that, as to the attachment judgment creditor, the judgment was, that she should not be preferred to the older attachment creditors, though she had judgment and they had not. Their attachments were first served, and section *seven* says : in all cases, the attachment first served, shall

be first satisfied. The judgment of the Court, therefore, must have been what it was, had section eight been struck out of the Act.

But my objections to the judgment of this Court, depend more upon another thing. I think that both sections, seven and eight, of the Act of 1814, have been repealed. I consider them to have been repealed by the Dormant Judgment Act, as it is called, of 1822. These are my reasons for this opinion.

The words of the Judiciary Act of 1789, were: "But all the property of the defendant shall, nevertheless, be bound from the day of signing judgment". Those of the Act of 1792, were the same. Those of the Act of 1797, were also the same, except that for the words "from the day of signing judgment", were substituted the words "from the day of obtaining the first verdict". Then, the words of the Act of 1799 were: "All the property of the party against whom such verdict shall be entered, shall be bound from the signing of the first judgment; but where several judgments shall be of equal date, the first execution delivered to the Sheriff, shall be the first satisfied". The Act of 1810 made no change in this rule of the Act of 1799, material to any point involved in the present discussion.

Then came the Act of 1814. Its words are: "in all cases, the attachment first served, shall be the first satisfied". "No lien shall be created by the levying an attachment, to the exclusion of any judgment obtained by any creditor, before judgment is obtained by the attaching creditor". Now, these words, be their meaning what it may, to the extent of that meaning, are repugnant to the words of the Act of 1799, which words extend to all sorts of judgments, and therefore, to that extent, they repealed the words of that Act. It follows, that if the Act of 1799, as to the words of it aforesaid, should afterwards have been revived, the revived Act would be as repugnant to the two sections of the Act of 1814, as they had been to it, and it would, therefore, have repealed those two sections.

Now, the Act of 1799 was never, it is true, in this respect,

Erwin and others *vs.* Moore and others.

expressly revived. But that was done which was equivalent to reviving it. It was done by the Dormant Judgment Act of 1822.

The title of that Act is: "An Act to amend the 26th section of the Judiciary Act of 1799" &c. the very section which contains the words of that Act which I have quoted. The first section declares, "That all property of the party against whom a verdict shall be entered" (the very words of the Act of 1799,) "and a judgment signed thereon, in conformity to the provisions of the twenty-sixth section of the Judiciary Act of 1799, *shall be bound from the signing of the first judgment*", &c.—again the very words of the Act of 1799. Thus far, then, the rule of 1799 is re-enacted by the Act of 1822, and that rule now made a new law, is just as repugnant to the seventh and eighth sections of the Act of 1814, as they were repugnat to it when it was the old law. But this time, being the later law, it repeals them, as they had repealed it, when they were the later. If *repugnancy* repeals in one case, it does in the other ; for it is the same two things opposed both times. The only difference is, they change places as to posteriority.

The Act of 1822 went further—it not only repealed, as I think, those two sections, but it repealed what I conceive to have been the reason of those sections, viz: a desire, on the part of the Legislature, to make precedence in attachments, *analogous* to precedence in ordinary suits—to make it depend, in both cases, when other things are equal, upon the first seizure of property. In the second section, the Act says: "All judgments signed, on verdicts rendered at the same term of the Court, be considered held and taken to be of equal date, *and no execution founded on said judgments, obtained at the same term, as aforesaid, shall be entitled to any preference, by reason of being first placed in the hands of the officer*".

There are other reasons which go to show that those sections of the Act of 1814, were repealed by this Act of 1822.

Three days after the passage of this Act of 1822, the Legislature passed " an Act to authorize parties, plaintiffs, to issue

summons of garnishment in certain cases, as in cases of attachment", in which it was declared, that "when any money shall be paid into Court, or shall be raised by the Sheriff, or his deputy, or by a Constable, under this Act, the same shall be paid over to judgments or executions against the defendant, as in other cases, according to the priority established by law".

Now, the priority established in other cases of money in the hands of the Sheriff, Coroner or Constable, was a priority "*agreeable to the date of*" judgment. (*Act of* 1810, *Cobb*, 496.)

A garnishment is but a sort of attachment, and unless the Act of 1822 repealed the seventh and eighth sections of the Act of 1814, we have to say, that the Legislature intended there should be one rule of precedence, for one sort of attachments, viz: the rule of priority of service, and another rule for another sort, viz: the rule of priority of judgment.

If the Legislature did not intend to repeal these sections, they intended to leave the law in a condition which makes it a thing, in some cases, of which this is one, impossible to be administered.

For, say that the sections remain unrepealed, and that they mean what this Court held them to mean, viz: that among attachments, the first served shall be the first satisfied, and that as to ordinary judgments, the old law shall continue, and those judgments have precedence according to priority, whether as between themselves, or as between themselves and attachment judgments, then, how is the law to be administered in this case?

To answer this question, in the simplest way, let us suppose that the motions, with respect to the money in this case, had not been made at the term of the Superior Court, at which they were made, but at another and subsequent term—a term at which the attachments *first served*, had also got into judgment. This will, obviously, not vary the legal character of the case. Suppose the motions to have been thus postponed—in that event, the state of things would have been this: A fund, with three sets of claimants upon it, all having their claims in judg-

Erwin and others *vs.* Moore and others.

ment—the first set, say, having the youngest judgments, but judgments founded on the oldest attachments—the second set having an older judgment, but one founded on a younger at-. tachment—the third set having older judgments than the first,. and as old as the second, but judgments founded on ordinary· process.    The fund is not sufficient to pay all.

These are the facts to which the law is to be applied—how can it be done ?    The first set of claimants state their claim to the Court, and say our attachment was *first* served ; therefore, we must be satisfied before the second set of claimants—the Court says yes.    The third set say, ah, but our *judgment* is older than that judgment of the first set, and judgments have preference, according to age—the Court says yes.    The second set then say, true, and *our judgment* is as old as that judgment of the second set ; and therefore, whatever it gets, we are halves in—yes, says the Court.    But, break in the first set, our attachments are older than the attachment of the second set, and that gives us the right to take from it, whatever it gets from set No. 3—yes, says the Court.    But, says set No. 3, whatever set No. 1 takes from set No. 2, we are entitled to take from it, for our judgment is older than the judgment of set No. 3—yes, says the Court.    But, says set No. 2, we must have an equal division with set No. 3, for our judgment is as old as their judgment is.    And so, the fund would go round and round, world without end—the Court all the time sitting mechanically by, merely to serve as the motive power.

Did the Legislature intend such results as this should ever happen ?    But did it intend that they should be of perpetual recurrence ?

In addition to all this, I may say, in conclusion, that the general spirit and policy of our law, from 1789 downwards, has been to make precedence among creditors, depend upon the priority of their *judgments*.    A rule which depends upon this, is easily understood—easily administered—a rule that presents fewest temptations to fraudulent practices—a rule that best enables all concerned, to find out the condition of a debtor's prop-

*Erwin and others vs. Moore and others.*

erty—a rule of at least as much fairness, as any other—above all, a rule with which the business mind is familiar.

For these reasons, I dissent from the judgment of the Court, and think that that judgment should have been one giving the fund to the attachment judgment, and the general judgments, in proportion to their respective amounts, and postponing the attachments not in judgment, though oldest in date, to all of the judgments.