## In re BLALOCK et al.

District Court, N. D. of Georgia. January 3, 1929.

No. 13008.

Spalding, MacDougald & Sibley and John A. Sibley, both of Atlanta, Ga., for Atlanta & Lowry Nat. Bank.

Sam L. Olive, of Atlanta, Ga., for Georgia State Highway Commission.

J. W. Culpepper, of Fayetteville, Ga., for Fayette County.

Hugh Howell, of Atlanta, Ga., for trustee.

BARRETT, District Judge. By act of the General Assembly of Georgia of 1915 (Georgia Laws 1915, p. 233) the office of county treasurer of Fayette county, Georgia, was abolished after the 1st day of January, 1917. The further pertinent provisions of the said act are as follows:

"* * * The commissioners of roads and revenues of said Fayette county shall by a majority vote taken among themselves, select some bank, banks, or bankers in said county to act as depository or depositories and disbursing agent or agents of and for the public funds of said county."

"* * * No such bank shall be allowed to act as such depository and disbursing agent, until it shall have given a bond, payable to said commissioners, with the securities to be by them approved, conditioned for the faithful performance of all the duties pertaining to said appointment. * * * The property of such bank or bankers as well as the security or securities on such bond shall be bound from the time of the execution thereof, for the payment of any and all liability arising from the breach of said bond."

"* * * All said depositories and disbursing agents shall be liable both civilly and criminally just as county treasurers are liable, for any nonfeasance or malfeasance of duty."

Sections 2, 4, 10.

The Bank of Fayetteville was a partnership composed originally of S. T. & A. O. Blalock, and which upon the death of S. T. Blalock in 1918 had been conducted by A. O. Blalock, individually and as surviving partner and executor of S. T. Blalock. On September 7, 1927, a petition in bankruptcy was filed against the said partnership, resulting in an adjudication.

On January 8, 1925, the commissioners of roads and revenues of Fayette county made the Bank of Fayetteville a county depository and a bond was given in accordance with the terms of the aforesaid act. At the time of the bankruptcy the county had on deposit in such bank $47,448.30. Commencing in 1922 the Bank of Fayetteville had an account with the Atlanta & Lowry National Bank, and such business relationship continued until the bankruptcy. As security for the loans which were made to the Bank of Fayetteville by the Atlanta & Lowry National Bank, notes, accounts, choses in action, and mortgages on various pieces of real estate were indorsed, transferred, and executed. At the time of the filing of the petition in bankruptcy the state highway department had on deposit with the Bank of Fayetteville $14,205.79.

The questions to be considered come before the court through the report of a special master. Other issues were considered and determined by the said master, but there are only two for determination by this court: First, Fayette county claims a lien on all the property, real and personal, including choses in action, owned or acquired by the bankrupts and their sureties after the execution of the bond. The Atlanta & Lowry National Bank claims that its title or lien, whichever it may be, acquired on the property pledged with it as security, is superior to that of the county to the extent of the indebtedness thus secured. Second, the state highway department claims that, as a department of the sovereign state of Georgia, it is entitled to prevail as a preferred creditor by virtue of the state's prerogative right of preference. This right is denied by the county and by the Atlanta & Lowry National Bank.

■ 1. The determination of the issue between the county of Fayette, hereafter called county, and the Atlanta & Lowry National Bank, hereafter called Atlanta Bank, depends upon the real meaning of the act of 1915; or, stated within even narrower limits, it depends upon the meaning of this language in the act: "The property of such bank or bankers as well as the security or securities on such bond shall be bound from the time of the execution thereof, for the payment of any and all liability arising from the breach of said bond." Section 4.

The county claims that this language is equivalent to declaring that it had a lien on all of the property of the bank and its securities from the time of the execution of the bond. The Atlanta Bank does not contest this view; that is, that the language is equivalent to declaring a lien. While there might, in the absence of other legislation, be doubt as to giving this effect to such language, we find a legislative declaration to the effect that the language in the statute is equivalent to the declaration of a lien. In the Acts of the General Assembly of 1890–91, p. 104 (embodied in sections 1241 through 1245 of Park's Code of Georgia of 1914), it is declared in section 1244: "Nothing in preceding three sections shall be construed to affect the validity or force of the lien of any such bond from the date thereof as between the parties thereto." The bonds in question are those of "county treasurers," "tax collectors," and "tax receivers."

The law as to the bond of the county treasurer is found in section 572 of such Code, and provides: "When any official bond is executed by any county treasurer, or any person acting as such, the property of said treasurer, or any person so acting, as well as the security or securities on said bond, shall be bound from the time of the execution thereof, for the payment of any and all liability arising from the breach of said bond." And as to the bonds of collectors and receivers provision is found in section 1190 thereof: "The property of collectors, receivers, and of their sureties, is bound, from the execution of their bonds, for the payment of taxes collected and the discharge of their duties." In neither of these is the word "lien" used.

The county contends that the issue is conclusively determined in its favor by the Supreme Court of Georgia in the case of Seay v. Bank of Rome, 66 Ga. 609. There is no question that the language of such decision is sufficient to justify such conclusion, for in the second headnote, which is amply supported from the opinion, is this statement: "(a) The lien of the state is not limited to such property of the depository as may be reached by levy and sale, but extends to all the property, including choses in action," *if* the issue were raised under conditions similar to those in the Seay Case. The controlling question here is: Did the General Assembly intend to create a lien, not only upon the real estate and physical personal property of the bankrupt from the time of the execution of the bond to the county, but also upon its choses in action and upon the very money which was handled over its counter, both in the hands of innocent purchasers for value?

■ This court recognizes that it has no power of legislation; that, if the language is plain, the fact of a hardship resulting is not justification for giving any but the natural meaning to the language; but, on the other hand, the real intention of the General Assembly should always be sought; and if "giving a literal interpretation to the words will lead to such unreasonable, unjust or absurd consequences as to compel a conviction that they could not have been intended by the legislature" (25 R. C. L. p. 959), or "where the literal construction of an act will produce results so extraordinary and unjust that they cannot be deemed to have been within the legislative intent, the general language of the act must be restricted so as to accomplish the general intent and declared purpose of the act" (25 R. C. L. p. 971), or "a consideration of the whole legislation, or of the circumstances surrounding its enactment or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular case" (25 R. C. L. p. 973), then the court should interpret the statute according to its real rather than its apparently literal meaning.

The principles thus cited are sustained by authority as well as common sense, but in no place have I found a more satisfactory statement of these principles than that by Judge Hines in the consideration of this very act in Blalock v. State, 166 Ga. 465, on page 470, 143 S. E. 426, 428: "In the interpretation of a statute the courts must look diligently for the intention of the General Assembly. Penal Code, § 1. This is the cardinal rule in the construction of statutes, and the intention when ascertained must be carried into effect. Erwin v. Moore, 15 Ga. 361. The construction must square with common sense and sound reasoning."

■ The primary purpose of this act was to escape the expense of a county treasurer and to select a bank or banks which could "keep the money," as was its regular business, and could pay out the money as a disbursing agent as effectively as a county treasurer could do, for in the nature of things he must use a bank wherein to deposit the money, and which bank must pay out the money on his order. Is it credible that the county would have selected an agent, which to be safe and effective must be able to continue to function, and at the same time by the very terms and conditions of its selection deal to it a fatal blow? What is the business of a bank? Omitting some of its minor activities, such business is to borrow money from its depositors and from other banks and to lend such money at interest. The chief asset to any bank is confidence not only in its solvency, but also in its care and conscientiousness and the certitude that its representations, whether explicit or implicit, are true.

If the contention of the county be correct, there existed from the date of the execution of the bond to it a lien upon every promissory note, every chose in action and every piece of money that it owned. If a depositor placed money in the bank at one hour and drew it out the next hour, he had placed in the bank untainted or unincumbered money, and when he got it back it was tainted or incumbered. While he may have passed on the money to an innocent person, when he himself had no purpose of removing it from the possible enforcement of the lien of the county, if, on the other hand, at

the time he drew it out, or before he parted with it, he knew that there was a lien in favor of the county, and parted with his money for the purpose of preventing the enforcement of such lien, he would become liable to the extent of the money thus used for such purpose. De Vaughn v. Harris, 103 Ga. 102, 29 S. E. 613; Blanchard v. Bank, 158 Ga. 780, 124 S. E. 695. If such be the correct interpretation, no one would be willing to receive money or any chose in action that had passed through the bank, and of course that would mean that no one would put any money in the bank.

Is it credible that the bank, to whom was paid no compensation, other than the use of the money that might be deposited by the county, would have accepted such a position, with the certainty of such results, or is it credible that the county would have put the bank in this position? If such be the meaning, would not common honesty on the part of the officials of the bank have elicited from them a statement to all customers, whether in their receiving money or in receiving other choses in action, that the county had a lien, not only for the amount of its deposits, but for some unknown liability that might arise by reason of any infidelity in acting as a disbursing agent?

To ask these questions seems to me to imperatively demand an answer that such was not the meaning of the Legislature. But what shall we do with the language "the property," which at times is sufficient to embrace in its meaning choses in action, especially in view of the decision of the Supreme Court in the Seay Case.

There is abundance of authority to the effect that a word which has a definite ordinary meaning may have a different meaning under different conditions. What could be superficially more definite than the declaration that a deed or contract is "void." Yet the books are full of decisions to the effect that "void" merely means "voidable." As said by Justice Lamar in the case of Browne v. Edwards, 122 Ga. 277, 278, 50 S. E. 110: "It is but another of the many instances in which the word 'void' is to be construed as more nearly the equivalent of 'voidable.'"

"Property" has different meanings, according to the context, and may have different meanings in different parts of the identical statute. 32 Cyc. 649. It may have a restricted import, so that it will not embrace real estate (22 R. C. L. 38), and may have a meaning so as to exclude choses in action (22 R. C. L. 38).

One of the cases justifying this last principle is illuminating in the consideration of this issue. Chicago v. Hulbert, 118 Ill. 632, 8 N. E. 812, 59 Am. Rep. 400. A statute of the state of Illinois provided that "every person or company engaged in the business of receiving property in pledge, or as security for money or other thing advanced to the pawner or pledger, shall be held and is hereby defined to be a pawnbroker." The city of Chicago passed an ordinance in substantially the same language as the statute. Hulbert followed this method: The proposed borrower would go to him to pledge, say, a watch, and sign an application for a loan. Hulbert would have him go to a jeweler and have the watch valued, and then deposit the watch in a storage place and take a receipt for it. A note for the loan would then be signed, and Hulbert would take the warehouse receipt as security. The city of Chicago undertook to impose upon him a tax as a pawnbroker. In the decision the Supreme Court said:

"What was intended by the Legislature by the use of the word 'property,' in the act? Was it intended to embrace lands, personal chattels, bonds, notes, money, and stocks, or was the intention to give the word a more restricted sense, and confine it to articles of personal property? That the latter was the object we think is apparent. * * * Bonds and stocks and promissory notes could not have been intended, because they are pledged as security for money loaned by the banks all over the country, almost daily, and it has never been understood that our bankers are pawnbrokers; and yet such might be the result if the term 'property' was used in an enlarged sense, and intended to include every species of property. We think the Legislature intended by the use of the word 'property' to include only such articles of personal property as might be actually delivered over to the possession and custody of the person who advanced the money, and not stocks, bonds, notes or mortgages, or choses in action, or evidences of debt."

To give to this act the interpretation urged by the county will inevitably result in one of two things, either (a) that if the interpretation is correct, and shall become known to those who have been dealing with the bank, or who might deal with the bank, they would avoid it as unreliable and as a menace, and the bank would immediately cease to so act; or (b) if the fact were not known to those who might deal with the bank, the county would thus be in a position

to fortify itself against the unwary by maintaining a lien over every piece of property of every kind that passed through the bank.

Is it not entirely in accord with "common sense and sound reasoning" that the Legislature intended no such trap, that the county authorities did not at the time of the continuance in activity of the bank realize that there was such a trap, but that, on the other hand, the extent of the intent of the Legislature was that the county should have a lien upon the assets or property in the hands of the bank at the time of its insolvency? This meaning makes it consonant with the knowledge on the part of the Legislature of the Seay Case as applicable to an insolvent bank, which has ceased to function, and it must be remembered this decision was in connection with such an insolvent bank, and not against those who had dealt with the bank in good faith.

Can it be possible that the Legislature intended that this bank could go to the Atlanta Bank, pledge in good faith for value its choses in action, receive money that was unincumbered, lend the money thus received, and procure other choses in action, and in time pledge such new choses in action for other money and so on indefinitely, and thus actually take the money furnished by the Atlanta Bank to create property in the way of notes or other choses in action, all of which would become subject to this lien? Would not every sense of fairness rebel at attributing to the Legislature such an unworthy purpose?

It would take no seer to realize that, if the interpretation urged by the county were correct, it would apply to all state depositories as well, and inevitably there will be a paucity, if not an entire lack, of depositories which would be willing to handle the state's money under such conditions. It would be equivalent to the bank's mortgaging its entire assets and proclaiming the same to the world. It would have all of the ill effects of a merchant's mortgaging his stock of goods, deprived of the right of realizing from the sale of specifics.

Concern has not been given to the discussion as to whether the title passed to the notes and choses in action pledged by the Bank of Fayetteville to the Atlanta Bank, or merely whether there was a lien created by Acts 1924, p. 133, as contained in Code Supplement 12, 1926, chapter 6(A), art. 1, § 2, page 644, § 4270(4), provides: "Where the holder has a lien on the instrument, arising either from contract or by implication of law,

he is deemed a holder for value to the extent of his lien."

"Assets is as broad in its meaning as property" (5 C. J. p. 823); and yet, in the case of State v. Brobston, 94 Ga. 95, 21 S. E. 146, 47 Am. St. Rep. 138, the lien was not permitted to attach to the note from Brobston held by the bank, but only to the note thus held by the bank, subject to the right of offset by Brobston to the extent of the amount of his deposit with the bank. A literal application of the language of the statute in that case would have required a different result, but, the conditions being as they were, the result was proper.

My conclusion, therefore, is that the Atlanta & Lowry National Bank is entitled to a first claim or lien upon all the notes, accounts, and choses in action that were pledged to it for money advanced to the Bank of Fayetteville as against the claim of the county of Fayette.

2. The state of Georgia recognizes the common-law right of the state to priority of payment out of the effects of an insolvent estate. Robinson v. Bank, 18 Ga. 65; Seay v. Bank, 66 Ga. 609; Glynn County v. Brunswick Terminal Co., 101 Ga. 244, 28 S. E. 604. It is not questioned that the state highway department is entitled to like priority.

The finding of the special master, which is approved, is that the rights of priority of distribution of this estate are governed by the Bankruptcy Law of the United States. He entertained the opinion that the following portion of such law was controlling: "Debts owing to any person who by the laws of the states or the United States is entitled to priority." Section 54b(5), Bankruptcy Act of 1898 (11 USCA § 104(b)(5).

The master avowedly held himself controlled by the decision of the United States Supreme Court in Davis v. Pringle, 268 U. S. 315, 45 S. Ct. 549, 69 L. Ed. 974, that the United States was not "a person," as contemplated by this portion of the law, and the case of C. O. Pick Company (D. C.) 9 F.(2d) 207, applying the principes of the Pringle Case to the state. Had the law remained unchanged, the conclusion of the master was inevitable. However Congress, by Act approved May 27, 1926, amended the law, adding this proviso: "That the term 'person,' as used in this section, shall include corporations, the United States, and the several states and territories of the United States." 1927 Cumulative Annual Pocket Parts USCA, title 11, § 104(b)(7); 11

USCA § 104(b)(7). The amendment was[4] manifestly adopted as a result of the Pringle decision.

The state highway department is entitled to priority of payment out of the assets in the hands of the trustee by virtue of the prerogative right of preference belonging to the state. This does not mean that it has a preference in any of the property which was at the time of the bankruptcy pledged to the Atlanta Bank up to the extent of the interest of such bank therein.

Let appropriate judgments be entered in accordance with the foregoing opinion.