23919. JONES et al. v. FORTSON, Secretary of State, et al.

ARGUED JANUARY 3, 1967—DECIDED JANUARY 6, 1967.

*Harry S. Baxter, Thomas E. Joiner, Alex W. Smith, Hoke Smith, William H. Schroder, Milton A. Carlton,* for appellants.

*Arthur K. Bolton, Attorney General, G. Ernest Tidwell, Executive Assistant Attorney General, Harold N. Hill, Coy R. Johnson, Marion O. Gordon, Assistant Attorneys General, Alexander Cocalis, Deputy Assistant Attorney General, Joseph Jacobs,* for appellees.

*Marvin O'Neal, David W. Krasner,* for parties at interest not parties to record.

*N. Krasner,* in propria persona.

ALMAND, Presiding Justice. We are called upon by this appeal to review the order of the trial judge denying the prayers of the appellants that Ben W. Fortson, Jr., as Secretary of State of the State of Georgia, be enjoined "from causing to be laid before the Senate of the State of Georgia the returns of the incomplete general election for Governor held on November 8, 1966; from causing to be laid before the Senate of the State of Georgia any such returns which do not include the returns of a runoff held as required by law; and, from issuing a commission of election to any candidate for the office of Governor until a runoff is held" and that "the court enter its order that a runoff election for Governor shall be held between the two candidates receiving a highest number of votes in the voting on November 8, 1966, and fix the date for such runoff election," and sustaining the appellee's motion to dismiss.

Error is enumerated on this order.

This case is an action by qualified voters and taxpayers in

equity against Ben W. Fortson, Jr., as Secretary of State of Georgia. The appellants' statement of the case and the issue therein made and here for review is fair and accurate, and we adopt it.

"The trial court had before it plaintiffs' prayer for an interlocutory injunction and defendant's motion to dismiss. The case below was heard on the basis of the facts stated in the verified petition of plaintiffs and four stipulations as stated in the trial court's order. These facts from the petition and stipulation are summarized as follows.

"Plaintiffs are residents of Fulton County, Georgia, and are citizens of Georgia. All of plaintiffs are duly registered and qualified electors qualified to vote in the general election held on November 8, 1966, and in any runoff that might be held in order to complete the election process with respect to the office of Governor. The defendant is Ben W. Fortson, Jr., as Secretary of State of the State of Georgia.

"On November 8, 1966, a voting took place as a part of the process provided by law for the election of a Governor. On the ballots of said voting were the names of two candidates, Howard H. Callaway and Lester G. Maddox. Neither of said candidates nor any other said candidate received a majority of the votes cast on November 8, 1966. Out of a total of more than 958,177 votes cast, Mr. Callaway received 453,685 votes, Mr. Maddox received 450,900 votes, Ellis Arnall received 52,898 votes and others received a total of at least 691 votes. These figures are matters of public records maintained in the offices of the ordinaries in the various counties of this State as required by law.

"No runoff for the office of Governor has been held and defendant Fortson has taken no affirmative steps toward holding a runoff.

"Defendant Forston has publicly stated his intention to cause to be laid before the Senate of Georgia on January 10, 1967, the returns of the incomplete election instead of the returns of the runoff and will do so unless enjoined. When the returns of the incomplete election are laid before the Senate of the State of Georgia, the General Assembly will then, in accordance

with the announced intention of legislative leaders and members in general, proceed to purport to elect a Governor. Defendant Fortson will then, unless enjoined, issue a commission to the candidate so chosen by the General Assembly.

"Defendant Fortson, as duly elected Secretary of the State of Georgia, has served as Secretary of the State of Georgia continuously since February 5, 1946, and has served as an ex officio member of Election Laws Study Committees and was elected and served as Chairman of such Committees.

"Attached to Stipulation 3 is a copy of part of Senate Bill Number 1 introduced in the May-June 1964 Extraordinary Session of the Georgia General Assembly (Georgia Election Code) with certain marginal notations."

Stipulation 3 sets out the procedure pursuant to which the returns for election of Governor and certain other State officers are made by the ordinaries, transmitted (sealed, in the case of the Governor) to the Secretary of State, and, finally, transmitted by the Secretary of State to the Senate. Exhibit "B" to said stipulation is a copy of the Consolidated County Returns form and envelope used in the transmission of these returns in the election of Governor.

"The specific issues presented are whether the trial court erred in refusing to grant an interlocutory injunction as prayed, and in dismissing the petition and motion. The legal questions involved are as follows: A. Does the runoff provision of the Georgia Election Code, construed in relation to other pertinent statutory provisions, apply to the election of Governor? B. Is such provision as so applied prohibited by Paragraphs II, III and IV of Article V, Section I, of the Georgia Constitution? . . ."

The controlling question is whether Sec. 34-1514 of the Georgia Election Code (Ga. L. 1964, Ex. Sess., pp. 26, 174; *Code Ann.* § 34-1514), providing for the rules and regulations in the election of the Governor, is in irreconcilable conflict with Art. V. Sec. I of the Georgia Constitution of 1945 (*Code Ann. Ch.* 2-30). To find this answer we lay them side by side.

First, the provisions of the Constitution:

"The first election for Governor, under this Constitution, shall be held on Tuesday after the first Monday in November

of 1946, and the Governor-elect shall be installed in office at the next session of the General Assembly. An election shall take place quadrennially thereafter, on said date, until another date be fixed by the General Assembly. Said election shall be held at the places of holding general elections in the several counties of this State, in the manner prescribed for the election of members of the General Assembly, and the electors shall be the same." Ga. Constitution, Art. V, Sec. I, Par. II (*Code Ann.* § 2-3002).

"The returns for every election of Governor shall be sealed up by the managers, separately from other returns, and directed to the President of the Senate and Speaker of the House of Representatives, and transmitted to the Secretary of State, who shall, without opening said returns, cause the same to be laid before the Senate on the day after the two houses shall have been organized, and they shall be transmitted by the Senate to the House of Representatives." Constitution, Art. V, Sec. I, Par. III (*Code Ann.* § 2-3003).

"The members of each branch of the General Assembly shall convene in the Representative Hall, and the President of the Senate and Speaker of the House of Representatives shall open and publish the returns in the presence and under the direction of the General Asembly; and the person having the majority of the whole number of votes, shall be declared duly elected Governor of this State; but, if no person shall have such majority, then from the two persons having the highest number of votes, who shall be in life, and shall not decline an election at the time appointed for the General Assembly to elect, the General Assembly shall immediately, elect a Governor viva voce; and in all cases of election of a Governor by the General Assembly, a majority of the members present shall be necessary to a choice." Constitution, Art. V, Sec. I, Par. IV (*Code Ann.* § 2-3004).

Second, the provisions of the Georgia Election Code of 1964: "This Code shall apply to any general or special election in this State to fill any Federal, State or county office, and to any general or special primary to nominate candidates for any such office, and to any Federal, State or county election or primary

for any other purpose whatsoever: Provided, however, it shall not apply to any municipal primary or election." Ga. L. 1964, Ex. Sess., pp. 26, 28 (*Code Ann.* § 34-102).

"No candidate shall be nominated for public office in any primary or elected to public office in any election unless such candidate shall have received a majority of the votes cast to fill such nomination or public office. In instances where no candidate receives a majority of the votes cast, a runoff primary or election shall be held, between the two candidates receiving the highest number of votes, on the 14th day after the day of holding the first primary or election, unless such runoff date is postponed by court order. The candidate receiving a majority of the votes cast in such runoff primary or election to fill the nomination or public office he seeks shall be declared the winner. Only the electors entitled to vote in the first primary or election shall be entitled to vote in any runoff primary or election resulting therefrom; . . ." Ga. L. 1964, Ex. Sess., pp. 26, 174 (*Code Ann.* § 34-1514).

Neither counsel for the appellants nor for the appellees dispute the rules of law that (a) the General Assembly of this State has the power to enact any legislation affecting the people of Georgia which is consistent with the Constitution of Georgia and not repugnant to the Constitution of the United States, or (b) that a statute of the General Assembly which is in plain and irreconcilable conflict with an express provision of the State Constitution must yield to the Constitution as the supreme law. So we look to Article V of the Constitution to determine whether Election Code Sec. 34-1514 is in harmony with or in irreconcilable conflict with said article.

Over a long period of years this court and other courts in the several States have considered and laid down rules which have been accepted as correct and proper in determining if there is or is not an irreconcilable conflict between the constitution and a statute. In 16 AmJur2d 228-229, Constitutional Law, § 56, it is stated: "It is the obvious duty of the legislature to act in subordination to the state constitution, for with reference to the subjects upon which the constitution assumes to speak, its declarations and necessary implications are conclu-

sive upon the legislature. Thus, constitutional provisions prevent the enactment of any law which extinguishes or limits the powers conferred by the constitution."

In 16 CJS 208, Constitutional Law, § 70, it is stated: "A provision which expressly prescribes the manner of doing a particular thing is exclusive in that regard and impliedly prohibits performance in a substantially different manner. Thus, where the manner in which, or the means by which, a power granted shall be exercised are specified, such manner or means are exclusive of all others, and the right or power to use other means does not arise by implication even though considered more convenient or effective. Where the constitution defines the circumstances under which a right may be exercised, the specification is an implied prohibition against legislative interference to add to the condition. A constitutional provision directing the legislature to enact particular legislation carries no authority to enact something not included therein." In support of this conclusion the following cases are cited: Weinberger v. Board of Public Instruction of St. Johns County, 93 Fla. 470 (112 S 253), which holds that the legislature does not have the power to enact a law which by its own terms conflicts with a provision of the state constitution prescribing the doing of an act or arriving at a decision, the constitutional method being exclusive; In re Opinion of the Justices, 294 Mass. 610 (3 NE2d 12), which holds that where the constitution gives clear and minute directions as to the performance of a specific duty it can be performed in that way alone; Sturgis v. Spofford, 45 N. Y. 446, which holds that constitutional provisions for organizing the three departments of government exclude any other mode.

Under our Constitution and the decisions of this court, the State Constitution is superior in authority to an Act of the legislature in conflict with the Constitution, so where there is any conflict between a statute and the Constitution the provisions of the latter control. Constitution, Art. XII, Sec. I, Par. II (*Code Ann.* § 2-8002).

This court, in *Copland v. Wohlwender*, 197 Ga. 782, 787 (30 SE2d 462), stated: "It is insisted that the *Code*, § 24-2903,

is controlling. This section provides that 'vacancies occur and are filled as prescribed in cases of the judges of the superior courts, and the manner of proceeding is in every respect the same.' This section of the Code is a part of the chapter dealing with solicitors general. If this Code section is in conflict with the provisions of the Constitution relative to filling vacancies in the office of solicitors general, it must yield to the Constitution. 'The provisions of the Constitution are fundamental and controlling.' *Wood v. Arnall*, 189 Ga. 362 (6 SE2d 722). Therefore, this Code section is not applicable to the case under consideration."

In *Massenburg v. Bd. of Commrs. of Bibb County*, 96 Ga. 614, 617 (23 SE 998), this court held: "A constitutional office may become such, either by virtue of its creation as such by express provisions of the Constitution, or, being already in existence as a legislative office, it be established and recognized, and the term and mode of selection be prescribed by a Constitution adopted subsequent to its creation by the legislature; it then becomes a constitutional office, and thereafter not subject to control or modification by legislative enactment. Where the Constitution prescribes the manner in which a particular public functionary is to be elected, or prescribes the terms during which he shall hold office, the legislature is thereafter powerless to modify, enlarge or diminish that which is established by the Constitution. It has no power to shorten the term of a constitutional office (Howard v. State, 10 Ind. 99; Cotton v. Ellis, 7 Jones (N. C.), 545; State v. Askew, 48 Ark. 82) ; nor practically abolish the office by repealing provision for salary (Reid v. Smoulter (Pa.), 18 Atlantic Reporter, 445) ; nor extend the constitutional term (People v. Bull, 46 N. Y. 57; Goodin v. Thoman, 10 Kan. 191; State v. Brewster, 44 Ohio St. 589) ; nor provide for the choice of officers a different mode from that prescribed by the Constitution (People v. Raymond, 37 N. Y. 428; Devoy v. New York, 35 Barb. 264; 22 How. Pr. 226; People v. Blake, 49 Barb. 9; People v. Albertson, 55 N. Y. 50). If, therefore, the people in their sovereign capacity, in convention assembled, do by the terms of an organic law, established by them and for them, reserve unto themselves the right of

election to particular offices, the legislature cannot thereafter interfere with this reserved right and provide other means than those established by the Constitution for the election of incumbents to such offices, even though there be no negation of this right of legislative interference expressly stated in the terms of the Constitution. The reservation of the right itself is a sufficient safeguard against the encroachments of legislative power, inasmuch as such reservation of itself operates as a denial to the legislature of the right of interference. The legislative powers, with respect to subjects left under the legislative control, are coextensive with the limits of the State, and are circumscribed only by the wise discretion of the General Assembly itself; but respecting those rights and those things concerning which the Constitution has itself made provision, the legislature is without power."

In *Morris v. Glover*, 121 Ga. 751, 754 (49 SE 786), it was said: "Likewise, an office created by statute, but not defined in or recognized by the Constitution, may be abrogated by statute. But where an office is created or guarded by express constitutional provision, its scope can not be enlarged or lessened by statute, nor can the office be filled in any manner other than that prescribed by the Constitution."

An election for Governor of Georgia was held on Tuesday after the first Monday in November 1966, as provided in Par. II of Sec. I of Art. V of the Constitution of 1945. Paragraphs III and IV of that section and article provide that the returns for the election of Governor "shall be sealed up by the managers, separately from other returns, and directed to the President of the Senate and Speaker of the House of Representatives, and transmitted to the Secretary of State" (Par. III), who without opening them shall cause them to be laid before the Senate *on the day* after the two houses shall have been organized, the Senate shall transmit them to the House of Representatives, and on such day the Senate and House shall convene in joint session and open and publish the returns. If it shall be determined that a person has a majority of the whole number of votes he shall be declared the duly elected Governor of the State, "but, if no person shall have such majority, then from

16

the two persons having the highest number of votes, who shall be in life, and shall not decline an election at the time appointed for the General Assembly to elect, the General Assembly *shall* immediately, elect a Governor viva voce" (Par. IV) by a majority of the members present.   (Emphasis supplied.)

In our opinion it is plain and certain that where the canvassed returns show no person received a majority of the votes cast in the general election held on the date appointed by the Constitution, Art. V reserves to the General Assembly the power and right, by the vote of a majority of the members present on the date the returns from such election are submitted to it, to elect a Governor from the two persons having the highest number of votes.   The provisions of section 34-1514 of the Georgia Election Code of 1964 do not apply to the election of Governor where no person in the general election receives a majority of the votes—the "runoff" or selection between the two highest being reserved by the Constitution to the members of the General Assembly.

The court did not err in denying an injunction and dismissing the petition.

*Judgment affirmed.   All the Justices concur, except Duckworth, C. J., and Cook, J., who dissent.*

DUCKWORTH, Chief Justice, dissenting.   This day will stand in history as one on which all the voters in free Georgia were, for the first time since 1824 deprived of their right to choose with their votes the Governor who will rule over them.   This was done by a majority of the Supreme Court which has a long and proud record of guarding and upholding the rights of the individual.   They base their decision upon what they sincerely believe the Constitution demands.   But I, with equal sincerity, believe they are wrong and I shall set forth in this dissent my reasons for so believing and which I have urged upon my honorable colleagues as strongly as I know how.

There can be no escape from the fact that the amendment of 1824 (Ga. L. 1824, p. 41) had but one main purpose, which was—to empower the people to elect their Governor by their votes in a state-wide election for that purpose.   It repealed outright Sec. 2 of the 1798 Constitution which empowered

the General Assembly to elect a Governor and adopted the provision for election by the people. It also provided for election by the General Assembly in case no one had received a majority in the election, all of which has been kept in the Constitution, and is now found in Art. V, Sec. I, Pars. II, III and IV of the present Constitution (*Code Ann.* §§ 2-3002, 2-3003, 2-3004; Const. of 1945).

The majority base their decision on the provisions for sealing and transmitting the returns for the election, and if no one has a majority, "then from the two persons having the highest number of votes, who shall be in life, and shall not decline an election . . . the General Assembly shall immediately, elect a Governor."

If this foundation does not support the decision, as I confidently believe I shall demonstrate, then the judgment they render is clearly erroneous. I shall call to my support, some of the most eminent Justices who ever served here by quoting their exact words.

It is suggested that if we allow to stand as valid *Code Ann.* § 34-1514 (Ga. L. 1964, Ex. Sess., p. 26) which provides that the indispensable requisite to any election is that someone receive a majority of the votes, and it prescribes the procedure for securing such majority, and hence avoid a no-election by requiring the two receiving the highest number of votes in all cases where there is no majority to oppose each other in a runoff, then there would never be a need for the constitutional provision for the General Assembly to elect. One complete answer is that when it was put in the Constitution, there was no statute requiring a majority to elect, consequently, should the election fail to produce a person receiving a majority as the Constitution demanded, election by the General Assembly was the only way left to obtain a Governer. And since the question of ever having legislation requiring election by a majority was and still is a matter over which the Constitution, Art. III, Sec. I, Par. I (*Code Ann.* § 2-1301; see also § 2-1920; Const. of 1945) gives the General Assembly exclusive jurisdiction, it could not then be seen if such legislation would ever be enacted; consequently, the provision for election by the Gen-

eral Assembly was intended as a safety measure, and unquestionably was not intended to undo and nullify the sole purpose of the 1824 amendment which was indisputably to take from the General Assembly and place in the hands of the people the right to choose a Governor. Another obvious answer is that if in the runoff the candidates receive the same number of votes, there might be a need for it; and another complete answer would be: Well, what? No one would suffer, but the voters will have elected a Governor as the Constitution intends.

Another argument is advanced that the Constitution, Art. V, Sec. I (*Code Ann. Ch.* 2-30; Const. of 1945), after fixing the term and time of electing a Governor, states further that the date there fixed shall be the time for the election "until another date be fixed by the General Assembly" in some mysterious way restricts the legislature to fixing only one day when the election shall be held and completed. This contention is so obviously without substance or merit that no argument is necessary to refute it. Ample authority is there given to designate a week or even a month, or longer, if necessary to complete the election. But I take that constitutional provision as conclusive evidence that the Constitution intends for the legislature to have absolute control in setting forth essentials to an election and procedure by which such essentials may be met as provided by the 1964 Act for a runoff as well as when.

Finally, the argument is made that the requirement that the returns for the election for Governor be sealed up by the managers, separate from other returns, and sent to the President of the Senate and Speaker of the House, through the Secretary of State, precludes a discovery of whether or not someone received a majority of the votes. The fatal fallacy in such contention is a lack of recognizing what are *election returns*. Obviously, no returns from a portion of an incomplete election would be election returns. There can be no completed election under the 1964 Act until the procedure there prescribed for completing an election has been followed when necessary to secure someone with a majority. Too, the Constitution contains precisely the requirement in election of all the executive offices, and if that argument is sustained, all these offices will

be vacant if the General Assembly finds none of them has a majority, since there is no provision for the General Assembly to elect them and the statute says—no majority, no election. This strawman is knocked down when the truth is recognized, which is, that the Constitution refers only to returns from an election that has been completed as required by law. This means that the law requires counting the first votes and determining if a runoff is necessary to secure candidates with majorities, and if so, go forward with the election by runoffs, and only when this has been done can there be produced "returns for every election of Governor," which can be lawfully sealed and directed as the Constitution requires.

With the foregoing contents of the Constitution and the election law before it, this court's first duty is to apply and scrupulously observe certain rules for construction which this court has adopted by countless unanimous decisions. The cardinal rule requires diligent judicial search for the intent as disclosed by the Constitution or statute, and once this is discovered, render judgment giving it full effect. Among such cases are: *Henderson v. Alexander*, 2 Ga. 81, 85; *Erwin v. Moore*, 15 Ga. 361; *Atlantic C. L. R. Co. v. Postal Tel.-Cable Co.*, 120 Ga. 268, 276 (48 SE 15, 1 AC 734); *Gazan v. Heery*, 183 Ga. 30 (187 SE 371, 106 ALR 498); *Carroll v. Ragsdale*, 192 Ga. 118 (15 SE2d 210); *Thacker v. Morris*, 196 Ga. 167, 173 (26 SE2d 329); and *Thompson v. Eastern Airlines, Inc.*, 200 Ga. 216 (39 SE2d 225).

Listen to what the late Chief Justice Russell wrote for the court in *Gazan v. Heery*, 183 Ga. 30 (3) supra: "In the construction of a statute a court may decline to give a legislative Act such construction as will attribute to the General Assembly an intention to pass an Act which is not reasonable, or as will *defeat* the purpose of the proposed legislation." (Emphasis supplied.) Here is what Chief Justice Reid in *Thacker v. Morris*, 196 Ga. 167, supra, quoted from *Columbus R. Co. v. Wright*, 89 Ga. 574, 586 (15 SE 293): "The law is too wise, too just, and too important to be defeated by sticking in the bark and adhering to the literal meaning of words, when by so doing we would not only set at naught the legislative will, but impute

to our lawmakers the folly of making a provision at once mathematically absurd and legally impracticable." Our duty is to follow those teachings. If done we would allow the literal meaning of no words in either the Constitution or statute to defeat the undeniable intent of both, that the voters elect the Governor, and that the elective process be carried out to secure persons receiving a majority of the votes cast. There can be no challenge to the statement that the courts have a solemn duty if the statute will bear it to hold statutes constitutional, and if they are susceptible to more than one construction, give them that construction which will render them constitutional rather than unconstitutional. *Gazan v. Heery,* 183 Ga. 30, supra; *Moore v. Robinson,* 206 Ga. 27 (55 SE2d 711); *Barge v. Camp,* 209 Ga. 38 (70 SE2d 360).

Far from censuring the brilliant Mr. Hill, the Assistant Attorney General representing the appellee, I praise him for, while acting in his capacity of a partisan advocate, "fly-specking" and pointing out every provision of the Constitution and statute that when taken at its literal meaning, with complete disregard for the duty to effectuate the intent—to sustain rather than strike down as unconstitutional, all statutes—and the old law and the remedy, that might raise questions of validity. But a different duty is inescapably imposed upon every Justice of this court who must be neither partisan nor advocate. We can not escape the duty we bear to effectuate the intent if possible, and to consider the old law, the mischief, and the remedy, and render a construction that "represses the mischief and advances the remedy." On this last duty I wish to quote what Judge Nisbet, one of this court's most capable jurists wrote in *Henderson v. Alexander,* 2 Ga. 81, at page 85, supra. He said: "It is the duty of judges so to construe remedial statutes as to repress the mischief and advance the remedy. 11 Coke, 71b; 1 Kent, 464; and in the application of this rule they are to consider the law as it stood before the act—the mischief against which it did not provide—the remedy which the legislature has provided, and the reason of the remedy." See also *Code* § 102-102 (9), and cases annotated thereunder such as *Walsh v. City Council of Augusta,* 67 Ga. 293; *Barrett & Caswell v.*

*Pulliam,* 77 Ga. 552 (2); *Board of Tax Assessors v. Catledge,* 173 Ga. 656, 658 (160 SE 909); and *Gazan v. Heery,* 183 Ga. 30, supra.

As to the 1824 amendment to the Constitution of 1798, allowing the General Assembly to elect a Governor, the Constitution was mischievous because it disfranchised the voters, and the amendment was the remedy to enfranchise them. According to Judge Nisbet by whose opinion every present Justice is bound, our duty is crystal clear—"repress the mischief" which was legislative election of a Governor, 'and "advance the remedy," which is the 1824 amendment to allow the people to choose whom they wish to be Governor. Application of the rule announced by Nisbet, J., to the 1964 election code and particularly Sec. 34-1514 (*Code Ann.* § 34-1514; Ga. L. 1964, Ex. Sess., pp. 26, 174) thereof, it seems to me, gives this court no choice but to recognize the mischief of no law requiring a majority for someone for Governor in the election and the consequent choosing of a Governor by the General Assembly, and the remedy by the 1964 Act by requiring that someone receive a majority of the votes cast before there is an election, and then proceeding to stipulate the further procedure in that same election to find a candidate who received a majority which is required by the Constitution. I pose the question with all due respect to each of my respected associates of the majority, do you have even a shadow of doubt as to the mischief of both the old Constitution and the old statutes, which indisputably contained the potentials for robbing the people of Georgia of their right to choose, by their own votes, the person who should rule over them as Governor? That question is followed by the question as to whether the remedy for that mischief is abundantly found in Sec. 34-1514 of the 1964 Act? Finally, has the duty imposed by law upon each of us to "suppress the mischief and advance the remedy" been performed by the majority opinion? Subsequent enactments that are in irreconcilable conflict with previous statutes repeal previous statutes by implication; also the 1964 statute being expressly intended to constitute a comprehensive treatise of the entire election laws would likewise repeal by implication previous laws

on the subject. *Leonard v. State of Ga.*, 204 Ga. 465 (50 SE2d 212); *Mosley v. Lanier*, 213 Ga. 373 (99 SE2d 118). This disposes of all previous statutes cited by counsel and the majority.

There are two more questions that have been raised. (1) Did the Supreme Court in Forston v. Morris, 385 U. S. (87 SC, 17LE2d 330), decide this case? The answer is so plainly, no, that even a law student could give this answer. (2) Does failure to call the runoff within 14 days stated in the 1964 Act, supra, prevent a runoff? The object of this clause is to elect someone by a majority, and the time stipulation is incidental and merely directory. To effectuate the intent if necesary the 14-day provision may be disregarded. The "tail can not wag the dog." In *Wood v. Arnall*, 189 Ga. 362, 371 (6 SE2d 722), it is said: "The question here involved is not whether an official regularly elected by the people at the time and place prescribed by law could be deprived of his office by virtue of the mere failure of the General Assembly to canvass and declare the result as *directed* by the Constitution, for *manifestly the will of the people* could not be thus defeated." (Emphasis supplied.)

The foregoing constitutes my legal reasons for dissenting. But when this court does as the majority, in my opinion, has done here, turned the clock back 143 years to 1824, and takes from the hands of the Georgia voter, his ballot, which is the only sure defense against dictatorship, it thereby snatches it from the hands of the brave Georgia soldiers, airmen and sailors, who are now wading the swamps of Vietnam and facing death in the skies over that country, bleeding and dying, to place the ballot in the hands of the Vietnamese, although their own State denies by court judgment that privilege to them at home. Strip the citizen of his right to vote and you render him a helpless victim of a dictator. I cherish as my priceless blessing the confidence Georgia citizens have manifested in me by freely electing me as their humble servant as a Justice of their highest court five times, and I would suffer my arms severed from my body before I would betray their trust, or deprive them of their liberty to choose freely all officers who rule over them in the absence of compelling law that demands such after a

soul-searching examination fails to reveal, by observance of established rules of law, a way to hold such inhuman law did not require a judgment so openly in defiance of freedom and liberty.

Holding as I do the foregoing unshakable convictions, I am allowed no choice but an emphatic dissent.

I am authorized to state that Mr. Justice Cook concurs in this dissent.